## ALBERT F. EASTMAN *vs.* WILLIAM J. DUNN *et al.*.

### JULY 6, 1912.

PRESENT: Johnson, Parkhurst and Sweetland, JJ.

*(1) Pleading. Assumpsit. Election of Counts.*

Upon a declaration containing two counts in special assumpsit for breach of an express contract and two counts in indebitatus assumpsit, for the value of an option and for work and labor, the court did not err in refusing to order plaintiff to elect between the two sets of counts.

*(2) Pleading. Assumpsit. Verdicts.*

Where on a declaration containing counts for breach of an express contract and counts in indebitatus assumpsit, the jury found by a special finding that there was an express contract, it is to be inferred that a general verdict was based upon the breach of such an express contract.

*(3) Contracts.*

Where plaintiff under an agreement with defendant turned over to him an option whereby defendant received a valuable lease and in accordance with the agreement, looking to an ultimate partnership interest, devoted his time and services at defendant's request in an endeavor to carry out the agreement, upon the repudiation of the agreement by defendant, plaintiff may recover in assumpsit both the value of the option and of his services.

In such action, where the value of the option and of the lease obtained thereunder was shown by expert testimony to have been upwards of $23,000 at the time when it was procured, a verdict for $18,000 will not be disturbed.

Rule of damages, where breach consists in preventing the performance of the contract without the fault of the other party, who is willing to perform, fully stated.

*(4) Contracts. Agency.*

Where plaintiff entered into a contract with defendants who were joint lessees of certain property, defendants must be deemed to be agents each for the other in matters relating to their common interests.

(5)  *Pleading.   Counts.   Special Findings.*

Where upon a declaration in several counts, defendant had the opportunity to submit issues to the jury under each count, but refused, it cannot thereafter complain of a general verdict which the court finds to be conservative under the evidence.

(6)  *Contracts.   Option.*

Unless a contract or option provides for acceptance in writing, an oral acceptance is sufficient or it may be proved by the acts of the parties.

(7)  *Contracts.   Option.   Charge of Court.*

Charge of court that if the jury found for plaintiff he would be entitled as damages to the fair market value of a lease at the time he turned it over to the defendant, was not prejudicial, where plaintiff had accepted an option whereby he might have taken the lease in his own name and assigned it to defendant, but to avoid this circuity permitted it to be made direct to defendant.

(8)  *Contracts.   Charge of Court.   Gift.*

Charge of court that if plaintiff had an accepted option that was of value, as defendant claimed it was a gift to him, the burden was upon defendant, to establish that position and to satisfy the jury by a fair preponderance of the evidence that it was a gift, was proper.

(9)  *Evidence.*

In an action for breach of contract, between plaintiff and defendants, where defendants were joint lessees of certain property and had joint interests analogous to that of partners, plaintiff was properly permitted to introduce evidence for what it was worth, of things done by him at request of one defendant at a time when latter had told plaintiff that he and the other defendant were having nothing to do with each other, as plaintiff did not know the breach was irreconcilable and the evidence tended to show the relations of the parties and that plaintiff was acting in good faith in an endeavor to carry out the agreement, since each defendant was the agent of the other in matters of their common interest.

(10)  *Manufactured Evidence.   Secondary Evidence.   Proving Notice of Claim by Parol.*

A duplicate carbon copy of a letter sent by plaintiff to defendant by registered mail, which was a mere notice intended to ascertain whether defendant would carry out his 'agreement with plaintiff without stating what such agreement was, is not open to the objection of being manufactured evidence, and also comes under the exception to the rule regarding secondary evidence, that a notice of claim may be proved by parol or by duplicate and the original need not be required.

It was also admissible in connection with admissions of and conversations with defendant, to connect and explain them and show that the action was not prematurely brought.

(11)  *Evidence.   Credibility.*

Evidence tending to prove that defendant had made statements that he had rehearsed his story with others and would swear the court house out if

necessary, was properly admitted as affecting his veracity, as well as on the ground of public policy.

*(12) Evidence. Motive.*

In an action for breach of contract where plaintiff had permitted defendants to obtain a lease under an option held by plaintiff, the motive which influenced plaintiff to delay before accepting the option, within the time provided for such acceptance, is immaterial.

*(13) Contracts. Evidence. Damages. Values.*

Upon the question of the value of an option, testimony of a real estate broker, as to its value and also as to the value of the property at certain dates and the rate of increase in value of the property during a certain period and the reasons therefor, was admissible both as showing his familiarity with the property and other surrounding property, as a part of his qualification as an expert, and as showing the value of the option.

*(14) Expert Testimony.*

The competency of persons offered as experts is generally a question for the trial court, and unless its ruling is palpably and grossly wrong, it will not be reversed.

*(15) Contracts. Evidence.*

In an action for breach of contract upon the question of the value of an option where it appeared that plaintiff had accepted the option and made use of it as a basis of an agreement with defendant, whether he could have exercised it himself without aid from others or could have gotten anything for it from other parties, is immaterial.

*(16) Contracts. Evidence. Damages.*

Upon the question of the value of an option, turned over to defendant whereby he acquired a lease, evidence as to a statement made by defendant of his price for the lease, as well as a paper containing figures given by defendant to a real estate agent to be used in interesting a prospective purchaser of the leasehold interest shortly before the trial, are admissible as admissions against interest as well as to explain in connection with other evidence the treatment of plaintiff by defendant, after he had acquired plaintiff's rights.

*(17) Contracts. Evidence.*

In an action for breach of contract upon the question of the value of an option where it appeared that plaintiff had accepted the option and made use of it as a basis of an agreement with defendant, whether he paid anything for the option is immaterial.

*(18) Contracts. Evidence. Damages.*

In an action against defendant for breach of contract, upon the question of the value of an option acquired by defendant from plaintiff, evidence offered by defendant tending to prove that the owner of the property had been trying to sell it at a lower figure and had given a previous option at a lower figure, was properly excluded.

*(19)   Contracts.   Evidence.   Damages.*

In an action against defendant for breach of an agreement, upon the question of the value of an option acquired by defendant as a result of such agreement from plaintiff, evidence as to whether the owner of the property would have allowed plaintiff to accept the option if he had not had a satisfactory financial backer, was immaterial and properly excluded, where it was provided in the option that plaintiff should give bond with sureties satisfactory to the owner, which contemplated such a financial backer and plaintiff testified that he had one before he met defendant.

*(20)   Expert Evidence.   Opinions.*

Evidence calling for opinions from witnesses as to the value of the testimony of other experts is properly excluded.

*(21)   Contracts.   Evidence.*

In an action against defendant for breach of an agreement upon the question of the value of an option, evidence of an expert as to whether in his experience he had ever known an option on real estate to be sold for any considerable sum was properly excluded.

ASSUMPSIT.   Heard on exceptions of defendant, and overruled.

PARKHURST, J.   This is an action of assumpsit brought in the Superior Court for the counties of Providence and Bristol, April 29, 1909, by Albert F. Eastman against William J. Dunn and Daniel C. O'Connor, to recover damages for breach of an express contract set forth in the plaintiff's declaration in two counts.

In the first count the plaintiff sets forth that on or about the first day of May, 1908, he was the owner of and held a certain instrument in writing or option, so-called, from one David F. Sherwood, providing that the plaintiff might lease or purchase on certain terms a certain tract of land bounding on Mathewson and Clemence streets, in the city of Providence; that he was desirous of carrying out the terms of said option and of obtaining money to erect upon said premises a building for the purpose, among other things, of conducting therein an amusement business; that on the date aforesaid the defendants offered to provide the funds for the purposes aforesaid, and that it was then agreed between him and them that he should surrender and turn over this option to them so that they might take, in their own names, a lease of the premises in accordance with the terms of the option; that it

was further agreed by the defendants, in consideration of the surrender and turning over to them of this option, that before the expiration of a year from May 1, 1908, they would erect and in a workmanlike manner finish a substantial building upon the premises, costing not less than $10,000, and would equip a portion of it suitably for use as a theatre for moving picture performances and such things, and would, thereafter and within a year from the making of the agreement, enter into an agreement in writing which should provide that all three should be equal owners of the amusement business to be carried on in the building, and of the income from the building, and that he should give his time to the management of this amusement business and property, and that the three of them should share equally in the profits of the business after defendants had been reimbursed for their advances.

The plaintiff then alleged in this count that he performed his part of the agreement and surrendered and transferred his option to the defendants, who accepted it and accepted from Mr. Sherwood a lease of the premises in accordance with the option for the period of twenty years after May 1, 1908; and that they failed to carry out their agreement by erecting, completing and equipping a building upon the premises and refused to go forward with the performance of their agreement; that they declined to enter into any contract or agreement with the plaintiff with reference to the ownership, conduct, and management of the amusement business.

In the second count of his declaration the plaintiff alleged that on or about the twentieth day of April, 1908, he was the owner of a certain instrument in writing or option, so called, described as in the first count, and proceeds substantially as in the first count; and further alleges that on that day the defendants agreed to enter into a copartnership with him to conduct and operate a theatre and to carry on an amusement business in Providence; that to that end he agreed for his share in the venture to contribute his interest in this option and to give his time, skill and ability to the conduct and management of this amusement business, and

for their share the defendants agreed to erect and furnish within a year in a workmanlike manner a substantial building on the premises at a cost of not less than $10,000, and to equip a portion of it for use in the amusement business, and to bear all expenses up to the time said building was ready to be operated for said business; and that it was further agreed that from the first proceeds of this business and from rentals the defendants should be reimbursed for the capital invested in the enterprise, after which all three parties should share equally in the profits and losses of said business and property.

The plaintiff then further alleged in this count that he put the option into the business and caused Mr. Sherwood to execute a lease to the defendants according to the terms of the option and permitted them to be named as lessees in the lease in order to secure them for their investment of $10,000 in the building to be erected by them upon the premises for the purposes of the partnership; that he has always been ready to perform his part of the agreement, but that the defendants have refused to enter into said copartnership, and to contribute their share toward the partnership business and to erect, complete and equip a building upon the premises and have declared that they would not carry out the agreement. In each count the plaintiff claims $50,000 damages.

May 4, 1910, the plaintiff filed three additional counts. As the first of these, the third count of the declaration, was withdrawn at the trial, it need not be now considered. The next one was a count in *indebitatus assumpsit* reciting that the defendants were indebted to the plaintiff in the sum of $50,000 for so much money due and payable from them to the plaintiff for a certain option or right of the plaintiff to purchase and lease certain land, then and there sold and delivered to the defendants at their request, and accepted and used by them, and a lease of the land acquired in accordance with it.

The last count was also in *indebitatus assumpsit* reciting that the defendants were indebted to the plaintiff in the sum

of $50,000 for various things, among them "for certain work
and labor, skill, care and diligence" . . . "performed
and bestowed by the plaintiff for the defendants at the
defendants' request" . . . and for money paid, laid
out and expended to and for the defendants at their instance
and request.

The plaintiff also filed a bill of particulars of what was
claimed under these additional counts, setting forth two
items, one of $50,000 for the value of the option for a lease
from David Sherwood or the lease from Mr. Sherwood to the
defendants covering the property at the corner of Clemence
and Mathewson streets, in Providence, and dated May 1,
1908, the other of $5,000 for work and labor done and time
spent in relation to removing the old buildings upon this
property and for work and labor done, time spent and ideas
evolved in developing plans, specifications and blue prints
for the erection and equipment of a building upon the
property, the interviewing of persons and contractors and
for cash expended in reference thereto.

After the filing of this bill of particulars the defendants
filed a motion that the plaintiff be required to elect between
the original counts of his declaration and the additional
counts, on the ground that the latter were inconsistent with
the former, being based on the non-existence of an express
contract between the parties, while the former were based
on the existence of such a contract. This motion was denied
by the Superior Court and the exception taken to the ruling
is the first exception set forth in the defendants' bill of
exceptions.

The case was tried before Mr. Justice Brown and a jury
between May 1 and 9, 1911, and resulted in a verdict for the
plaintiff for $18,000, with certain special findings. The
defendants did not file a motion for a new trial, but came
directly to the Supreme Court upon a bill of exceptions.

The facts of the case are substantially as follows: David
F. Sherwood, the owner of the property in question, gave to
the plaintiff a written instrument dated March 25, 1908, and
filed as Plaintiff's Exhibit 1, by which he offered to sell the

property to the plaintiff for the sum of $42,000 or to give him a lease of it for twenty years at certain rentals, with a privilege of purchasing it during the first two years for $45,000; during the next five years for $47,500, and during the succeeding three years for $50,000. It provided that the gangway at the southerly boundary of the property must remain open, as provided in the deeds to Mr. Sherwood, and that the lessee must erect within one year after the execution of the lease a substantial building to cost not less than $10,000, and to become the property of the lessor at the end of the lease, in case the lessee did not purchase the land, and required that a bond be given with sureties satisfactory to Mr. Sherwood that this building would be built as stated.

The option was in the words and figures following:

"PROVIDENCE, R. I., March 25, 1908.

"MR. ALBERT F. EASTMAN,

"Providence, R. I.

"DEAR SIR:

"First. I offer to sell you my estates designated as No. 116 Mathewson street and No. 43 Clemence street, in the City of Providence, said estates together running from Mathewson street to Clemence street, for the sum of Forty-two Thousand Dollars ($42,000).

"Second. I offer to lease you the above estates for the term of twenty (20) years from April 20th, 1908, at the following rental: For the first ten years, $1,680 per year, and for the next succeeding ten years, $2,520 per year, said rent to be payable quarterly, *provided* that you pay in addition all current taxes, curbing assessments, sewer assessments and assessments of every kind which may be imposed upon said property during the continuance of the lease, so that the above named rental shall be net to me.

"*Provided*, further, that you shall erect within one year after the execution of the lease, a substantial building, which shall cost not less than Ten Thousand Dollars ($10,000), which shall have proper foundation and which shall be erected

in accordance with the Building Laws of the City of Providence. And *provided*, further, that you shall give a bond with sureties satisfactory to me, that such building will be erected as above stated. And said building and any improvements made by you upon these estates shall become the property of myself, my heirs and assigns, upon the termination of the lease, unless you elect to purchase the estates as hereinafter provided.

"In case you take the lease of said estates, you are to have the privilege at any time during the first two years of the same to purchase the property for the sum of Forty-five Thousand Dollars ($45,000); during the succeeding five years for the sum of Forty-seven Thousand Five Hundred Dollars ($47,500); and during the succeeding three years for the sum of Fifty Thousand Dollars ($50,000). *Provided*, that at any of the above times at which you may elect to purchase the same, you shall give one month's notice in writing to me; and *provided*, further, that all taxes and assessments which are imposed or ordered to be imposed prior to the transfer of the title shall be paid by you.

"The above offers of sale and of lease are expressly subject to the condition that the gang-way at the southerly boundary of said property, between Mathewson and Clemence streets, shall remain open as provided in the deeds to me, and also subject to the conditions and agreements as to party walls contained in the agreement between William H. Hall and Herbert D. Goff, Trustees of the Central Real Estate Company, and myself, which agreement is duly recorded in the land records of the City of Providence; and if you elect to take a lease of said premises, any payment or money or any other obligations resting upon me by the terms of said party wall agreement shall be assumed by you during the term of said lease.

"You further understand that the premises are now rented to tenants who hold from month to month and that it would be necessary to give sixteen days notice in writing prior to

the first of any month in order to have said premises vacated by the tenants.

"Rents from present tenants shall be apportioned if the deed or lease running to you is signed other than at the first of the month.

"This offer for you to purchase or lease the above described premises shall remain open for twenty-five (25) days from this date.

"Yours very truly,

(Signed)                                   "DAVID F. SHERWOOD."

This instrument expired by its terms on April 19, 1908; but Sherwood agreed and so admits, that as the 19th of April fell on Sunday, he considered that the option stood open until Monday, April 20th, and acted on that understanding.

The plaintiff had obtained the offer or option in furtherance of a plan for having a building erected on the property, in which he could run a moving picture theatre, which he believed would be profitable. He and his wife hoped to be able to provide the necessary money themselves for erecting the building, but found that to be impossible and abandoned that idea not long after he got the option.

He then sought to find some one to go into the enterprise with him and put up the necessary money. Very shortly before the option was to expire he heard of the defendants as persons who might be induced to go into such a proposition and he arranged an interview with them. A few days before this interview took place he went to Mr. Sherwood and asked for an extension of time for accepting the offer, which was refused.

The interview took place at the Narragansett Hotel in Providence, the plaintiff giving the date of it as April 18, and other witnesses on the subject as April 20, the 19th being Sunday. What occurred at this interview is in dispute, the plaintiff claiming that the defendants then and there made with him the contract on which be brought suit and the defendants denying this. It is admitted that the interview

ended about six o'clock in the evening, and that at its con-clusion the plaintiff called up Mr. Sherwood at the latter's house over the telephone and arranged to meet him at the Union Station in Providence, where Mr. Sherwood was then about to go.

The plaintiff and the defendant Dunn had a short inter-view with Mr. Sherwood at the station, but what occurred there is in dispute, the plaintiff stating that he simply told Mr. Sherwood that he accepted the offer for a lease and introduced Mr. Dunn to him as the man who would go on the plaintiff's bond as required by the option and that Mr. Sherwood agreed and told them to meet him Monday afternoon at the office of Mr. Pirce, of Gardner, Pirce & Thornley, Mr. Sherwood's counsel. Mr. Sherwood and Mr. Dunn both testified that nothing was settled at this interview, but that Mr. Dunn said that he was interested in the matter and asked for an extension of time to consider it, which Mr. Sherwood refused, except that he agreed to hold the matter open till the next day.

On Monday afternoon according to the plaintiff, on Tues-day afternoon according to other witnesses, the parties and Mr. Sherwood and Mr. Washburn, Mr. Sherwood's broker, met with Mr. Pirce in the latter's office and discussed matters, and it was arranged that a formal instrument of acceptance or contract should be drawn, to be executed at a meeting of all parties to be held in Mr. Pirce's office the next Thursday afternoon.

Late in the afternoon of the next Thursday, April 23, the second meeting in Mr. Pirce's office took place, the persons present being Messrs. Pirce, Sherwood, Washburn, Eastman, Dunn, O'Connor and O'Donahue, attorney for Dunn and O'Connor. At this meeting a formal contract between Sherwood on one side and Dunn and O'Connor on the other was drawn up after a long discussion of terms between them and their counsel, in which discussion East-man took no part.

Just before executing this contract, Mr. Sherwood called Mr. Eastman's attention to the fact that the latter's name was not mentioned in it and asked him if that was satisfactory to him. Mr. Eastman replied that it was; that he had an understanding or arrangement or agreement, as different witnesses put it, with Dunn and O'Connor. The contract was then executed by the parties to it, and is on file as an exhibit in the case.

The contract provided for the execution of a lease from Sherwood to Dunn and O'Connor on May 1, 1908, and one was drawn up and was executed on that day at a meeting in Mr. Pirce's office which Eastman did not attend. This lease is also on file as an exhibit in the case.

All these instruments provided that the lessee or lessees should erect on the leased premises within one year after the execution of the lease a building to cost not less than $10,000.

Accordingly very soon after the lease was executed some small buildings upon the premises were sold to a man, who removed them, and the defendants employed a contractor to excavate for the proposed building. Shortly after this an application for a building permit in the name of "Wm. J. Dunn et al." was filed at the city hall in Providence by the authority of Mr. O'Connor, Mr. Dunn having meantime gone to Europe. The purpose of the proposed building was given as "theatre, business building and hall." The work of excavating was continued steadily for somewhere about six weeks, when it was stopped, because Mr. O'Connor was unwilling to go further in Mr. Dunn's absence. After that work was done only at irregular intervals, without accomplishing much, because upon Mr. Dunn's return in September he and Mr. O'Connor quarreled and would have nothing to do with each other. During much of this time the plaintiff was present and overseeing the work, looking to the erection and completion of the building as agreed.

In the fall of that year the plaintiff had an interview or two with Mr. Dunn at which the plaintiff asked what was going to be done and was told by Mr. Dunn that the defend-

ants were not agreeing, but that he would see what could be done and take the matter up with the plaintiff later. On December 9, 1908, Mr. Dunn wrote the plaintiff a letter asking when he could meet him at the Narragansett Hotel. Soon after that they met at the hotel and talked the situation over. Just what took place at that interview is in some dispute, but it is agreed that Mr. Dunn told Mr. Eastman that he didn't propose to have anything more to do with Mr. O'Connor, but intimated that he would try to get the latter's interest in the property and suggested to Mr. Eastman that he go to some architect and have plans drawn of a building that would suit Mr. Eastman's purposes and provide also for a hall that could be rented and bring in a good income.

In accordance with this suggestion the plaintiff had several interviews with some architects and had some plans drawn. He then saw some contractors and had them make estimates of the cost of erecting a building in accordance with the plans. He and Mr. Dunn also had several interviews with representatives of the Knights of Columbus, who were looking for a hall and club rooms, and tried to arrange satisfactory terms with them for leasing to them the rest of the building besides what would be needed for a theatre. As no agreement could be reached with them, the whole matter remained in abeyance. The plaintiff, after vainly trying to get some further information from the defendants whether or not they proposed to carry out their agreement with him, on March 26th, 1909, wrote to each a letter which is substantially a notice that he would be obliged to resort to legal proceedings to protect his rights; to these letters he received no reply. On April 29, 1909, having got no definite assurances from either of the defendants as to what they would do, the plaintiff brought the present action.

The plaintiff testified that when he got the so-called option from Mr. Sherwood, he had expected that enough money could be collected in on accounts due to his wife to enable him to construct a building on the premises as required by the terms of the option; that he soon found, prob-

ably within two weeks, that this could not be done and that he then tried to raise the necessary money by interesting somebody else, but had not found anybody interested until he met the defendants.

He said that about the Tuesday or Wednesday before the option would expire he went to Mr. Sherwood and asked for an extension of time on it, but did not get it. About this time he told a Mr. Fahey about the option and that he had not been able to get the money from the source from which he expected it and Mr. Fahey suggested that he knew two men who he thought would put up a building there, if they could be shown it was a good investment. An interview with them was arranged and he met them, according to the plaintiff's testimony, about eleven o'clock in the morning, on Saturday, April 18.

He says that he told the defendants that he had secured a piece of property on Mathewson street for the purpose of erecting a theatre to be used for a moving picture show and hadn't been able to get the money from the source from which he had expected to get it and was ready to talk with anybody who would erect a building for him. He says they examined the option and all went and looked at the property. After returning to the hotel he told them, he says, that he would agree that if a person would put in the money that was necessary to build the building on that land, he would allow the entire revenue of the property to revert to the people who spent the money until they had got back the money they had spent and then they would all be equal owners. He suggested a moving picture business and a hall upstairs was discussed.

It was finally agreed, he testified, that the defendants should put up the building for him, that he should take entire charge of the property, run a moving picture or other theatrical business there and take a living salary from the proceeds of the business from the time he took possession of the building until they had been entirely reimbursed for the money they had spent, and then all should share equally

in the profits of the business and the income from the build-ing, he guaranteeing that he would pay them back at the rate of $5,000 a year or lose all his interest in the business. He was not to put any money into the enterprise.   He told them that anything that was beneficial to all of them he would agree to, and it was agreed that the defendants could take the lease in their own names as security for the money they were to spend in putting up the building.   After the matter had been all talked over until late in the afternoon, he said, Mr. Dunn and Mr. O'Connor went one side and came back and Mr. Dunn said, ''Well, I guess we will accept that proposition.   Now, then, you would better see Mr. Sherwood, as I am desirous of getting this thing closed up while I am here."

Mr. Eastman then called up Mr. Sherwood and talked to him on the telephone.   He did not then accept the option, but arranged to meet Mr. Sherwood at the railroad station a little bit later.   Eastman and Dunn then went over to the station and met Sherwood.   Eastman testified that Dunn told him on the way over to tell Sherwood that he would go on Eastman's bond for $10,000; that when they met Sher-wood, he, Eastman, said to him, "I want to accept the lease under the option and Mr. Dunn will go on my bond," and that Sherwood said, "All right.   I don't know Mr. Dunn personally, but I have heard of him and I will accept him as surety."   Then Sherwood suggested that they all meet in Mr. Pirce's office the next Monday, and it was so arranged. On cross examination he testified that he introduced Dunn to Sherwood and told the latter that he knew that it was necessary by his option to furnish a bondsman satisfactory to Sherwood.

The plaintiff also testified that the next meeting of the parties took place in Mr. Pirce's office on Monday after-noon.   There they made arrangements for a drawing of a letter of acceptance, which he told Mr. Pirce to draw in the name of Dunn and O'Connor, and then adjourned to Thurs-day afternoon at the same place, when the formal agreement

was drawn and executed. He testified further that he was to get an agreement in writing and that at the meeting on Thursday, when the agreement between Sherwood and Dunn and O'Connor had been executed, he said to the two latter, "Now, gentlemen, I think it will be a good time to draw up our agreement," but that Dunn postponed it a few days on account of the lateness of the hour. This conversation took place in the presence of all the persons who attended this meeting, he said.

He said that he tried afterwards, repeatedly to get the defendants to enter into a written agreement with him, and that they separately promised to do so, but that he never could get them together. He said that he took part in negotiating the sale of the buildings on the premises to the man who removed them, went to Boston at O'Connor's request to look at some theatre chairs which the latter had bought and made some trips to other cities on his own account to get ideas for the moving picture theatre business. He also put on the stand two men to testify as to statements made by the defendants with reference to the plaintiff. Of these, Patrick J. Hennessy testified that while Dunn was gone abroad, he asked O'Connor who Eastman was, having seen him around the premises while the excavation was going on, and that O'Connor told him that he and Dunn had the lease and were going to build a theatre there and that Eastman was to have charge of it; that they were going in on equal shares; that Eastman was to have a salary and the rest of the returns from the building was to go to Dunn and O'Connor and after the building was paid for they were to be equal partners in the building. He testified that O'Connor said that Eastman was a partner with them.

The other man, Frank Slavin, the contractor who did the excavating, testified that while he was working there he had asked O'Connor about Eastman, and O'Connor had told him that Eastman was going to run a theatre there, when it was ready. He also said that later he saw Dunn in Fall River and asked him who Eastman was and that Dunn said,

"Well, he is a partner with us and after we get this thing. completed we expect he is going to run it."

The plaintiff, against the objection of the defendants,. introduced evidence by three real estate brokers as to the value of the land involved in the case, as to how much in their opinion it would increase in value during the period of ten years following the spring of 1908, how much profits in their opinion could be made by exercising the privilege provided for in the option of buying the property at the end of ten years for $50,000, and how much the present value of that profit would be in the spring of 1908, which they gave as their estimate of the value of the option. These estimates were upwards of $23,000. This testimony was introduced on the theory, insisted on by the plaintiff and denied by the defendants, that the value of the option could be recovered from the defendants and that its value could be shown in this way.

The plaintiff also introduced evidence of what the defendant Dunn had asked for the defendants' leasehold interest and estimates which he had given to a broker to be shown to a prospective buyer. These amounts ran from $23,000 to $30,000. The defendants objected to all these lines of testimony as to the value of the option, and their objections were overruled and exceptions noted. They then introduced the testimony of three real estate men to the effect that the probable increase in the value of the property was highly speculative and a matter of individual opinion, and that in their opinion all that a man holding such an option as the plaintiff had could expect to get for it was the equivalent of the ordinary broker's commission, which would figure about $570.

As to the events leading to the taking of the lease by the defendants, they and their witnesses tell a very different story from that of the plaintiff. O'Connor testified that he first met Eastman on Saturday, April 18, about noon, at the Union station, in Providence; that Fahey introduced them and they talked about the Mathewson street property; that

Eastman said that his time was expiring and wanted to know whether Dunn and O'Connor were interested in it or not; that he told Eastman that Dunn would be in the city Monday and they would talk it over; that Eastman said that that would be too late, as the option would expire; that Eastman wanted to know if he couldn't help him to get an extension of time and seemed so concerned about the matter that he suggested that Eastman and Fahey go and see Mr. Sherwood and ask for an extension; that he told Fahey that he could use Dunn's name and his, if he needed to; and that the other two left him and went off to see Mr. Sherwood.

Mr. Sherwood testified that on the Saturday before the option expired Eastman and Fahey came to his office in the afternoon and requested an extension of time, which he refused to give; that Eastman did not at that time accept the option, but said that Mr. Dunn, of Fall River, who was a man of means, was interested in the matter and would go on his bond; that Fahey said that Dunn was worth half a million dollars and was absolutely responsible, and he replied that if that was so Dunn would be acceptable; that the date of the expiration of the option was spoken of, and as it ran out on the 19th, the next day, which was Sunday, he told Eastman that he considered that it would include Monday, and that he did not see Eastman again until Monday afternoon or evening at the depot.

As to the meeting of the parties at the Narragansett hotel, both of the defendants testified that that took place on Monday, and O'Donahue, who came in just as it was breaking up, testified to the same date, which he verified from his diary, and said was the Monday after Easter. Both Dunn and O'Connor testified that they did not make any contract with Eastman to build a theatre building on the premises, in which a theatrical business should be carried on by Eastman for the equal profit of all three, or agree to put any arrangement between them into writing; that on the contrary they refused to consider the proposition from a theatrical standpoint, but would simply look at it from an

investment standpoint, whether a building on the premises would be a good investment; that Eastman said that he could not exercise the option or accept the offer, as the time was just about up and he had not been able to do anything with it; that finally Eastman said that if Dunn and O'Connor would take the option, he would trust them to do right by him; that they told him that if they took it over and decided to put up a theatre there, they would certainly look after him, if he cared to go into the theatrical business there, and give him first chance; but that they did not at that time decide to take up the proposition at all, and it was suggested that Mr. Sherwood be asked to hold the matter open a little longer.

At the meeting with Mr. Sherwood at the Union Station at the conclusion of this interview, about six o'clock, according to Mr. Dunn's testimony, Mr. Eastman stated that this was Mr. Dunn, of Fall River, who was interested in the property, and that he would like to have the thing held up for a day or two; Mr. Sherwood said that the time was up that night and Mr. Dunn told him that he had only met Mr. Eastman that day and had not had sufficient opportunity to look over the property to decide on it then, but that if Mr. Sherwood would give an extension, he might do it. Mr. Dunn said that he would like three or four days, but Mr. Sherwood said that he wouldn't give three or four days, but would give until the next day. Mr. Eastman did not accept the option and took no part in the conversation, except to say, "This is Mr. Dunn, of Fall River, and I have got him interested in that property." Mr. Sherwood's testimony as to what took place at this interview is the same as Mr. Dunn's in every particular. He fixed the date as Monday, April 20, and said that the option was not accepted then, but was held over until the next day at Mr. Dunn's request.

According to Mr. Sherwood and Mr. O'Connor, the latter and Mr. Fahey came to see the former on Tuesday morning, and O'Connor testified that he then tried unsuccessfully to get Sherwood to give better terms. According to the testi-

mony of the defendants and of Mr. Sherwood and Mr. Pirce, the first meeting of all the parties interested took place in Mr. Pirce's office on Tuesday afternoon.

The defendants both denied that they made the statements testified to by Hennessy and Slavin as to Eastman's being a partner with them, and both testified that O'Connor had nothing to do with Dunn's causing the plaintiff to see architects and contractors and the Knights of Columbus in the fall of 1908 and the winter following. All that work was done at Dunn's suggestion after he had informed the plaintiff that he and O'Connor were not working together and were not even on speaking terms.

During the taking of testimony at the trial many exceptions were taken by both sides, and at the conclusion of the testimony the defendants made a motion that the jury be directed to return a verdict for them on the fourth count of the declaration, and a similar motion as to the fifth count, and motions that these counts be withdrawn from the consideration of the jury, and also that they be struck out as not supported by the evidence. All these motions were denied and exceptions taken.

They then made a motion that the plaintiff be required to elect whether he would rely on the first two counts of his declaration, those in special *assumpsit*, or on the last two counts, those in *indebitatus assumpsit*. When that motion was denied and an exception noted, the defendants made a motion that the jury be directed to find separately upon the issues presented in each count of the declaration submitted to them and this motion was denied unless the defendants would prepare special issues for the purpose, which the defendants declined to do and took an exception to the ruling of the court.

The defendants then made a motion that a certain special issue be submitted to the jury as being a short statement of the issue raised by the second count of the plaintiff's declaration, and this motion was denied and an exception noted. A number of exceptions were also taken by the defendants to

certain parts of the court's instructions to the jury, and also to the refusal of the court to give certain instructions requested by them.

The jury returned a verdict for the plaintiff in the sum of $18,000, as already stated, and in answer to questions submitted to them for special findings they found as follows:

(1) The plaintiff did accept the Sherwood option dated March 25, 1908, and the right to the lease thereunder.

(2) The plaintiff did not transfer his rights under said option to the defendants as a gift, trusting to their generosity and sense of fairness.

(3) The plaintiff did, in assenting to the lease mentioned in the option signed by Sherwood, dated March 25, 1908, being executed in the names of the defendants as lessees, do so in consideration of an agreement between him and the defendants to the effect that they should erect a building on the premises in which a moving picture show should be conducted substantially as testified to by the plaintiff.

Within seven days after this verdict was rendered the defendants, without filing a motion for a new trial, filed notice of their intention to prosecute a bill of exceptions. In due time a bill of exceptions and a complete transcript of the testimony, etc., were filed and allowed in the Superior Court and the case transmitted to this court, and is now before us on the merits of the defendants' exceptions.

Of the ninety-five exceptions set forth in the defendants' bill of exceptions they do not now insist upon those numbered 2, 3, 4, 5, 7, 10, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 28, 29, 30, 35, 36, 42, 46, 48, 49, 50, 51, 58, 62, 65, 67, 68, 71 and 73. Many of the others group themselves under a comparatively few heads and some need be considered only incidentally. The defendants assert that a decision of the two principal questions involved in the case will dispose of the great majority of them, and that the questions arising for discussion are as follows:

1. On the facts of this case can any recovery be had on counts in *indebitatus assumpsit?*

2.   Was the plaintiff entitled to go to the jury both on the first two counts of his declaration and also on the last two counts?

3.   What was the proper measure of damages on the facts of this case?

4.   Was there any evidence to support a verdict on any of the counts of · the declaration for more than nominal damages?

5.   Was it reversible error on the part of the trial court to refuse the defendants' motion that the jury be instructed to find separately upon the issues presented in each count of the declaration and to refuse to submit to the jury the special issue requested by the defendants?

6.   Was there reversible error on the part of the trial court in giving any of the instructions excepted to by the defendants?

7.   Was there reversible error in refusing to give any of the instructions requested by the defendants?

8.   Did any of the rulings made during the taking of testimony at the trial constitute reversible error?

(1)     Defendants strenuously contend that the several counts in the declaration as finally amended, the first and second counts being for damages for breach of an express contract, while the fourth is a count in *indebitatus assumpsit,* for the value of the option purchased from the plaintiff by the defendants, as above set forth, and the fifth count is for labor and services performed at the request of the defendants, are inconsistent counts, and by motions at different stages of the case, both before the case was on trial and after the evidence was closed, sought to have the trial court order the plaintiff to elect whether to proceed on the first two counts or the later counts.   It is to be noted that no demurrer was filed, either to the declaration as a whole or to the counts, but the defendants pleaded the general issue to each.   We do not find that the court below erred in refusing to order the plaintiff to elect under the motions.   The action is assumpsit and the several counts are all in assumpsit, and theoretically

each count is for a different cause of action, the first for damages arising from breach of an express contract for failure on the part of the defendants to do certain things; the second for damages arising from breach of an express contract stated in slightly different terms to do certain other things; the fourth on an implied contract to pay for the option above set forth sold and transferred to the defendants at their request; the fifth on an implied contract to pay for labor and services done by the plaintiff for the defendants at their request. We see nothing inconsistent in the joining of these counts in one action, the parties being the same in each instance, and the matters alleged growing out of the same transaction. It is merely the ordinary instance of the pleader setting forth his cause of action in different counts, so that if he failed of proof upon one count he might succeed upon another. "Before the pleading rules, Hil. T. 4 W 4 r. 5, a declaration might consist of numerous counts, and the jury might assess entire or distinct damages on all the counts; and it was usual, particularly in assumpsit and in actions on the case, to set forth the plaintiff's same cause of action *in various shapes*, in different counts, so that if he failed in the proof of one count he might succeed upon another. Such additional counts have been aptly termed *safety valves*." I Chit. Pl. (16 Am. Ed.) page 424; 5 Encyc. Pl. & Pr. 324; *Ware* v. *Reese*, 59 Ga. 588; *Wilson* v. *Smith*, 61 Cal. 209; *Whitney* v. *Chicago &c. Co.* 27 Wis. 327; *Stearns* v. *Dubois*, 55 Ind. 257; *Snyder* v. *Snyder*, 25 Ind. 399; *Sadler* v. *Olmstead*, 79 Ia. 121; See, also, *Rawlinson* v. *Shaw*, 117 Mich. 5; *Ralph* v. *Taylor*, 33 R. I. 503.

In this case, if the plaintiff failed to satisfy the jury that he had any such express contract as set forth either in the first count or in the second count, he might still be entitled to recover under the fourth count for the value of the option as sold and transferred, upon proof that the option was valuable; and might also recover for the value of his labor and services under the fifth count upon proper proof. We are of the opinion that he was entitled to file these counts

originally under the general practice long established in this State; and that to have compelled him to elect after the evidence was closed, whether to proceed to the jury under the first two counts or under the last two counts, would have been error, because it would have compelled him to determine beforehand for himself upon the sufficiency of the evidence before the jury, instead of leaving it to the jury to determine for themselves as to the sufficiency of the evidence to support any or either of the counts, thereby depriving him of the very benefit to which he was entitled under the rules of pleading permitting the filing of the several counts. The defendants were afforded the opportunity by the court at the trial, after the evidence was closed, to submit special issues to the jury under each count of the declaration, whereby, if they saw fit, the defendants might have so framed the issues as to have determined upon what counts the jury founded their verdict, and the amount of damages awarded under each or any of the counts. This the defendants declined to do, and they cannot now complain. Furthermore, inasmuch as the jury have found by their third special finding that there was an express contract between the plaintiff and the defendants substantially as testified to by the plaintiff, we think it is to be inferred that the general verdict of the jury was based upon the breach of such an express contract, and was an award of damages for such breach, based upon the testimony as to the value of the option transferred to the defendants; and that therefore the verdict of the jury was found under the first or second count of the declaration, and not under the fourth or fifth count, for reasons to be hereafter more fully developed. The exceptions based upon the refusal of the court below to require the plaintiff to elect between the first two and last two counts (Ex. 1 & 83) are therefore overruled.

A very large part of the argument of the defendants is devoted to an endeavor to show that the parties to this suit at the outset entered into a partnership agreement for the development of a theatrical or amusement business; and that

the plaintiff in this suit is endeavoring to maintain an action for the breach of a partnership agreement, and thereupon argues most persistently that such an action cannot be maintained at law; but contends that the plaintiff's only remedy is in equity for a dissolution of the partnership and settlement of the partnership accounts. We find no warrant for this contention under the evidence.

The defendants undoubtedly led the plaintiff to believe that they would enter into a partnership with him in the amusement business, upon the fulfillment of certain conditions, ultimately, but there is nothing to show that either at the time when the plaintiff transferred his option to the defendants and allowed them to procure the making of the lease to them as security for the advances they agreed to make, or at any later time these parties had actually formed a. partnership. The defendants took the lease in their own name, and the plaintiff was in no way responsible for the rent, nor had he any right thereunder either to occupation of the land or to make purchase thereof. The defendants were to build the building under the terms of the lease, and it was to be their property, in case they exercised their option to purchase, or Sherwood's if they did not, and they alone would be liable for expenses incurred in its building and equipment. The position of Eastman under his contract with the defendants, which he proved to the satisfaction of the jury, as shown by their special finding, was to be that of an employee of the defendants, having the right to occupy the building and run the business, taking only a living salary from the proceeds thereof, until such time as the profits of the business should have been sufficient to pay off all the advances of the defendants, at the rate of not less than $5,000 per year. After that had been done and then only was there to be any such relation between the parties as would constitute a partnership, and then only in the business, but not in the building or the real estate or leasehold. If Eastman did not succeed in paying from the business agreed to be under his charge, at the rate of $5,000 a year, until all the

defendants' advances were paid, he was to cease to have any interest whatever. It is plain therefore that the entire agreement between the parties was in no sense at any time a partnership agreement, but rather an agreement looking forward to the formation of a partnership in the future, in the event that Eastman succeeded in making it profitable to the extent that he anticipated, and that in the meantime he was to be in the position of a salaried employee of the defendants and a sublessee of the property. It might be that the conditions to be developed would never lead to the formation of the partnership, because the profits of the business might never be sufficient to fulfill the conditions upon which alone Eastman could ever become a partner and entitled to one-third of the profits. Since the defendants by their conduct, after they had obtained from the plaintiff his option for a lease and purchase of the property, and thereupon had secured the lease in their own names, in abandoning work on the building and declining to proceed with the undertaking, did nothing which in effect was of the slightest value to the plaintiff, and repudiated any legal obligation to him, claiming, that they never at any time had any binding contract with him, thus showing that they never intended in good faith to enable him to get any return for either his services or his option, they placed themselves in the position of having received from him a valuable option and valuable services contributed by him toward the contemplated enterprise, without ever paying him or intending to pay him any valuable consideration whatever for the same; so that in effect, while the plaintiff in good faith had done all that he agreed to do, and contributed all that he had agreed to contribute so far as he was permitted to do so, the defendants entirely failed to perform the contract or any portion thereof on their part to be performed, and in legal effect, are in the same situation toward the plaintiff as if they had never done anything in fulfillment of their contract. The claim on the part of the defendants, therefore, that the contract on their part was partly fulfilled, cannot be maintained. By their

failure to carry out their part of the contract the defendants have made it impossible forever to determine what would have been the value of the contract, if carried out, to the plaintiff; so that, on the theory argued by defendants' counsel that the plaintiff can only recover what the value of the contract would have been to him, if it had been fully carried out by the defendants, they have by their own conduct, and by their repudiation of all legal obligation to him, made it impossible for the plaintiff to recover anything. Such a theory is so unjust in its application to the facts of this case, that the mere statement of it sufficiently refutes it. It is plain that a contract of the nature above set forth, is one which cannot be enforced, if, as in this case, the defendants see fit to repudiate it, and it makes no difference whether it is non-enforceable as being within the statute of frauds, or for reasons inherent in the very nature of the contract. The case is closely analogous to those cases which have frequently arisen, where upon agreement for the sale or exchange of land, the plaintiff has fulfilled his part of the contract by making conveyance of his land to the defendant, and the defendant has refused either to pay the agreed price or to convey land agreed to be conveyed in exchange; or where in consideration of labor and services or materials supplied by the plaintiff in making repairs or planting and cultivating the soil, or of money or its equivalent paid, the defendant has agreed to convey land, and after receiving the agreed consideration, refuses to fulfill his contract. In all these cases it has been repeatedly held that the plaintiff is entitled to recover at law in assumpsit either the value of the land conveyed by him, or the value of the consideration advanced by him, whether in money or materials or labor. *Basford* v. *Pearson*, 9 Allen, 387; *Root* v. *Burt*, 118 Mass. 521; *Williams* v. *Bemis*, 108 Mass. 93; *Kneeland* v. *Fuller*, 51 Me. 518; *Moody* v. *Smith*, 70 N. Y. 598; *Smith* v. *Smith*, 4 Dutcher (28 N. J. L.) 208.

We think the case at bar is quite analogous in principle to the cases cited. While it is true that the plaintiff did not

in fact convey to these defendants an actual estate in land, yet he did under the contract he made with them turn over to them his option whereby they became entitled to receive and did in fact receive a valuable lease of property in one of the best business districts of Providence, with an option of purchase of the real estate upon favorable terms. He did also, in accordance with his agreement, looking to an ultimate partnership interest, devote his time and services at their request in the endeavor to carry out the agreement; through no fault of his, by their own subsequent acts, they failed to so carry out the agreement as to enable him to receive any consideration whatever either for the option or for his services and ultimately repudiated and denied any legal or contractual obligation to him whatever, thus showing that they never intended to act in good faith in carrying out any agreement with him. Under these circumstances this court is of the opinion that the plaintiff, in this action is entitled to recover both the value of the option so surrendered to the defendants and of which they have availed themselves, and for the value of his services rendered at the outset of the work looking toward the erection and equipment of the building.

The case at bar is quite analogous to those cases where there has been an agreement to form a partnership, but no partnership business has in fact been done, and the defendants after receiving value, either by way of money contribution, or of labor and services, or of business done by the defendants for their own benefit which should have been partnership business, have been held liable in assumpsit either for the money contributed by the plaintiff, or for labor and services rendered, or for the profits on the work done. *Hale* v. *Wilson*, 112 Mass. 444, 449; *Vance* v. *Blair*, 18 Ohio, 532; *Currier* v. *Webster*, 45 N. H. 233; 2 Bates, Law of Partnership, §§ 870–876 & cas. cit.

In the case of *United States* v. *Behan*, 110 U. S. 338, Behan, the defendant in error, had been engaged in doing work in the improvement of the harbor of New Orleans under

a government contract and had expended a large amount of money for machinery, labor and materials, including his own labor in carrying on the work; before the work was finished, and before he had received any money under the contract, the work was abandoned by the government and he was prevented from finishing the work under the contract; it was found that there was no satisfactory evidence as to what would have been his profit under the contract, if completed. The United States Supreme Court, after stating fully the findings of fact and conclusions of law of the court of claims, and in support of the same says, p. 343: "We think that these views, as applied to the case in hand, are substantially correct. The claimant has not received a dollar, either for what he did, or for what he expended, except the proceeds of the property which remained on his hands when the performance of the contract was stopped. Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the government should have proven this fact. It will not be presumed. The court finds that his expenditures were reasonable. The claimant might also have recovered the profits of the contract if he had proven that any direct, as distinguished from speculative, profits would have been realized. But this he failed to do; and the court below very properly restricted its award of damages to his actual expenditures and losses.

"The *prima facie* measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely: first, what he has already expended towards per-

formance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract. The second item, profits, cannot always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires. But when, in the language of Chief Justice Nelson, in the case of *Masterson* v. *Mayor of Brooklyn*, 7 Hill, 69, they are 'the direct and immediate fruits of the contract,' they are free from this objection; they are then 'part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation.' Still in order to furnish a ground of recovery in damages, they must be proved. If not proved, or if they are of such a remote and speculative character that they cannot be legally proved, the party is confined to his loss of actual outlay and expense. This loss, however, he is clearly entitled to recover in all cases, unless the other party, who has voluntarily stopped the performance of the contract, can show the contrary.

"The rule as stated in Speed's case is only one aspect of the general rule. It is the rule as applicable to a particular case. As before stated, the primary measure of damages is the amount of the party's loss; and this loss, as we have seen, may consist of two heads or classes of damage—actual outlay and anticipated profits. But failure to prove profits will not prevent the party from recovering his losses for actual outlay and expenditure. If he goes also for profits, then the rule applies as laid down in Speed's case, and his *profits* will be measured by 'the difference between the cost of doing the work and what he was to receive for it,' etc. The claimant was not bound to go for profits, even though he counted for them in his petition. He might stop upon a showing of losses. The two heads of damage are distinct, though closely related. When profits are sought a recovery for outlay is included and something more. That something

more is the profits. If the outlay equals or exceeds the amount to be received, of course there can be no profits.

"When a party injured by the stoppage of à contract elects to rescind it, then, it is true, he cannot recover any damages for a breach of the contract, either for outlay or for loss of profits; he recovers the value of his services actually performed as upon a *quantum meruit*. There is then no question of losses or profits. But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is, the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services. If he chooses to go further, and claims for the loss of anticipated profits, he may do so, subject to the rules of law as to the character of profits which may be thus claimed. It does not lie, however, in the mouth of the party, who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend (including his own services), after making allowance for the value of materials on hand; at least it does not lie in the mouth of the party in fault to say this, unless he can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract." . . .

"It is to be observed that when it is said in some of the books, that where one party puts an end to the contract the other party cannot sue on the contract, but must sue for the work actually done under it, as upon a *quantum meruit*, this only means that he cannot sue the party in fault upon the stipulations contained in the contract, for he himself has been prevented from performing his own part of the contract upon which the stipulations depend. But surely, the wilful and wrongful putting an end to a contract, and preventing the other party from carrying it out, is itself a breach of the contract for which an action will lie for the recovery of all damage which the injured party has sustained. The dis-

tinction between those claims under a contract which result from a performance of it on the part of the claimant, and those claims under it which result from being prevented by the other party from performing it, has not always been attended to. The party who voluntarily and wrongfully puts an end to a contract and prevents the other party from performing it, is estopped from denying that the injured party has (not) been damaged to the extent of his actual loss and outlay fairly incurred."

We are of the opinion that the rule of damages set forth in the above quotation is quite applicable to the facts shown in the case at bar. While the plaintiff has not shown that (4) he actually spent any considerable sum of money in attempting to fulfill his part of. the contract, yet he has shown that he devoted a large amount of time to the enterprise at the request of either or both of the defendants, who as they were acting together as lessees of the property, must be deemed to be agents, each for the other, in matters relating to their common interests; and he has further shown, to the satisfaction of the jury, that he also turned over to them his accepted option whereby they were enabled to obtain a valuable lease of property situate in the "retail district" of Providence in a very valuable location, said lease containing a valuable option of purchase. We are unable to see what difference it makes whether the plaintiff actually conveyed valuable real estate to the defendants for which they refused to pay, or whether, by virtue of his accepted option, he enabled them to get title to such real estate; he did actually enable them to obtain such property, and they, repudiating their contract with him, availed themselves of the value thereof. This property was indeed the foundation of the entire enterprise into which the plaintiff appears to have entered in good faith with the defendants, without which such enterprise would have been impossible. The value of the option and of the lease obtained by the defendants thereunder has been shown, by the evidence of expert real estate men, giving the best evidence obtainable thereof, to

have been upwards of $23,000 at the time when it was procured, and we see no reason to doubt that such value was a fair and reasonable one, having in mind the situation of the property, its then value, its probable increase in value, and the favorable terms of purchase contained therein. The claim on the part of the defendants that the plaintiff is at most entitled to recover a mere broker's commission of less than $600 is quite untenable under the facts. He was not acting as a broker as between Sherwood and the defendants. He was not attempting as the agent of Sherwood to place a right to the lease in the hands of parties who would take it, for the benefit of Sherwood, but he was acting for himself in the attempt to build up a business which he believed would be profitable to him and to the defendants in the future, and he furnished the foundation upon which such a business could have been built. We are of the opinion that the evidence amply supports the special findings of the jury that the plaintiff did accept the option, that he did not transfer his rights thereunder as a gift trusting to the generosity and fairness of the defendants, and that, in assenting to the lease being executed to the defendants as lessees, he did so in consideration of an agreement between him and the defendants, substantially as he testified. And inasmuch as the jury by their general verdict found only the sum of $18,000, which is many thousand dollars less than was testified to as the probable value of the option, we are led to believe that the jury took a very conservative view of the values testified to by the experts, which were corroborated by the values shown to have been placed thereon by one of the defendants, and that they took into account the uncertainties which always exist as to the future increase of value of real estate; and we are further led to believe, in view of these considerations, that the verdict of the jury was based solely upon the value of the option and this lease obtained thereunder, and not upon the services claimed to have been rendered by the plaintiff, because of the fact that he was unable to furnish definite testimony either as to the actual amount of

time spent by him, or as to expense incurred. As we have before shown, the defendants had every opportunity, if they had seen fit, to have submitted such issues to the jury under each count, as to have ascertained definitely, whether the jury found under one or more of the counts, and the amounts of such findings; but they refused to avail themselves of such opportunity. We think they are not now entitled to complain of the verdict, which, as we have shown, is conservative and evidently based upon the value of the option alone. We think, therefore, that the verdict of the jury was fully supported by the evidence, and that the rule of damages given to them by the court and under which they found such verdict was a proper rule under the circumstances of the case.

These considerations dispose of a very large number of the entire sixty-one exceptions which are pressed before this court. A large number of them are based upon the mistaken conception of the defendants' counsel as to the proper rules of pleading in relation to the inclusion of the several counts in one declaration, and as to the admissibility of testimony to prove the damages which the plaintiff is entitled to recover; and many of them are based upon an erroneous view of the testimony with regard to the relations of the parties, in the endeavor on the part of the defendants to sustain the position that the parties were partners and therefore no action at law could be maintained for breach of a partnership contract. It would be futile and would unduly extend the limits of this opinion if we should take up in detail each one of the defendants' exceptions. Indeed, counsel for the defendants substantially admits this in his brief, and has discussed only a few of the exceptions specifically. We therefore proceed to discuss only such of the specific exceptions as have not already been substantially overruled.

The subject of the defendants' 85th exception is the refusal by the trial judge to submit to the jury a special finding in the following form, to wit.: ''Did the defendants

agree with the plaintiff to enter into a partnership with him for the acceptance of the Sherwood option and the erection of a building for theatrical purposes, with money to be furnished by the defendants, and the operation of a theatre in said building and to divide the net profits of the business between them, as claimed by the plaintiff?"

The defendants' counsel asked that this be submitted to the jury as a short statement of the most vital part of the second count, but the trial justice refused to allow it; we find no error in such refusal. This is one of the attempts on the part of the defendants to obtain a finding that there was an agreement for a present partnership between the parties. As we have already shown, there was no evidence of such agreement nor is any such agreement set forth in the second count, as is attempted to be submitted in the above quoted language. The refusal to submit it was proper and the exception is overruled.

Certain instructions referred to in the 88th and 89th exceptions are substantially as follows: At the bottom of page 807 of the transcript, the trial justice told the jury that notice of the acceptance of an option need not be given verbally where the acceptance is sufficiently indicated by subsequent acts or conduct of the parties; and that if from the acts and conduct of Mr. Eastman and Mr. Sherwood, both understood that Eastman had accepted the option and he did accept in this way, in that case he had a right which can be recognized in law, and, if valuable, would entitle him to recover, unless, as the defendants claimed, he gave it to them. At the bottom of page 817 and the top of page 818, the jury were told that if the plaintiff accepted the option, either in so many words or by act or conduct from which it was understood by him and Mr. Sherwood that he had accepted, then he had the right there. These instructions were correct; there was evidence of the oral express acceptance of the option by Eastman; also sufficient evidence as to the conduct of the parties, from which the jury were authorized to find an acceptance of the option; and unless a contract or

option provides for acceptance in writing, an oral acceptance is sufficient, or it may be proved by the acts of the parties.

(6) *Springer* v. *Cooper*, 11 Ill. App. 267; *Graves* v. *Smedes*, 37 Ky. 344; *Woodlock* v. *Meyerstein*, 5 Mo. App. 591; *Souffrain* v. *McDonald*, 27 Ind. 269; *Smith's Appeal*, 69 Pa. St. 474; *Ives* v. *Hazard*, 4 R. I. 14, 27. These exceptions are overruled.

(7) A certain instruction referred to in the 91st exception is substantially as follows: In this part of the charge the jury were told that if they found for the plaintiff, he would be entitled to recover as an element of damages the fair market valuation of the lease at the time he turned it over to the defendants. It is contended that the plaintiff never had the lease and never turned it over to the defendants, and that therefore this instruction was erroneous, as not being based upon the testimony. The criticism is without merit. The plaintiff had accepted the option and might have taken the lease in his own name, and assigned it to the defendants; he was willing to avoid this circuity, and permitted it to be made direct to the defendants as security for their advances to be made; we find no substantial error in this instruction and as to the portion of it relating to the measure of recovery, we have already dealt with that question at length. The exception is overruled.

A certain instruction referred to in the 92nd exception, is substantially as follows: In this part of the charge the jury were told that if the plaintiff had the lease and it was his property and he turned it over to the defendants upon their promise to do certain acts and they failed to carry out those acts and had got that property, then he was entitled to its fair market value at the time he turned it over to them. This exception is substantially the same as the one last considered, is based upon the same grounds, and is overruled for the same reasons.

Certain instructions referred to in the 93d, 94th and 95th exceptions, are substantially as follows: In these parts of the charge the jury were told that if the plaintiff had an accepted

option that was of value, as the defendants had set up that it was a gift to them, the burden was upon them to establish their position in that respect, and to satisfy the minds of the jury by a fair preponderance of the evidence that it was a gift; and that therefore on the second issue submitted for a special finding the burden of proof was upon the defendants. We find no error in these instructions. The evidence on the (8) part of the plaintiff was that he had an accepted option which was of value, and that he had permitted the lease called for thereunder to be made direct to the defendants in pursuance of certain agreements on their part; the defendants denied that they made any agreements with him and set up that he had given them the option without any undertaking on their part, relying upon their generosity, etc. They thereby assumed the burden of proving the gift in accordance with the usual rule, that "he who alleges a gift has the burden of proving the same." *Wheeler* v. *Glasgow,* 97 Ala. 700, 701; *Bunker* v. *Tufts,* 55 Me. 182, 189; *Wilson* v. *Wilson,* 99 Ia. 688, 692; *Matter of Rogers,* 10 App. Div. (N. Y.) 593, 595; *Doty* v. *Willson,* 47 N. Y. 585; *Walker* v. *Welsh,* 11 N. E. 727, 728. These exceptions are overruled.

We deem it unnecessary to further consider in detail the exceptions relating to the instructions given to the jury; we have examined them in detail and have considered the briefs of counsel in relation thereto, and find that there was no prejudicial error in any of them; in view of the principles of law hereinbefore set forth, the charge taken as a whole properly set forth the principles appropriate for the guidance of the jury.

We have also examined in detail the special requests for rulings and instructions which were preferred on behalf of the defendants and refused by the trial judge; they are based upon erroneous views of the effect of the testimony, and of the rules of pleading and of damages, which we have fully discussed in the earlier part of this opinion; and we do not find it necessary or useful to discuss them further.

It remains only to discuss certain exceptions taken to the admission or rejection of testimony during the trial, which are specially referred to in the defendants' brief.

(9)     Exceptions 6 and 8 (pages 29 and 40). These were exceptions to the introduction of evidence of things done by the plaintiff at the request of the defendant Dunn, at a time when he had told the plaintiff that he and O'Connor were having nothing to do with each other. Defendants contend that these things could not on any view be charged against O'Connor, but if anybody should pay for them, it should be Dunn individually. But it does not appear that at this time the breach between Dunn and O'Connor was known to the plaintiff to be irreconcilable; and it does appear that what the plaintiff says he did was in an endeavor to assist Dunn at his request in "fixing it up" between the parties so that they could go on. It is evident that the defendants had joint interests analogous to that of partners in the tenancy and option of purchase under the lease, and in the construction of the building; and it appears that each of them had at times in the absence of the other made suggestions to the plaintiff as to what they wished him to do for the common interest. We think that each of the defendants is to be deemed the agent of the other in the matters of their common interest, and that the evidence was properly admitted for what it was worth, to show the relations of the parties and that the plaintiff was acting in good faith in the endeavor to carry out his contract with the defendants. We find no error in such admission and these exceptions are overruled.

Exception 9 (page 46). This was an exception to the admission in evidence of a copy of a letter which the plaintiff testified he wrote to each of the defendants and sent to them by registered mail. It was objected to on two grounds—first, because it was not the best evidence and no notice had been given to the defendants to produce the original, and second, because it was written by the plaintiff himself and had no relevancy except as proof of the truth of a claim made

by him in it; in other words, because it was manufactured testimony. We are of the opinion that the letter was properly admitted; it was a duplicate carbon copy without erasure or alteration of a letter proved to have been sent by registered mail to each of the defendants, and appears upon its face to be only a notice to them that the plaintiff would be obliged to resort to law for the protection of his rights. It does not purport to set forth the terms of any contract between the parties and cannot be regarded as self-serving. Nor, in view of the fact that the letter was a mere notice, intended to ascertain definitely if possible whether the defendants would carry out their agreements with the plaintiff without in any way stating what those agreements were, do we think it was necessary that the defendants be notified to produce the original; it seems to us to come within the exception to the rule regarding secondary evidence, to the effect that a notice of claim may be proved by parol or by duplicate and the original need not be required. 25 Am. & Eng. Ency. of Law (25 ed.) p. 171; *Eagle Bank* v. *Chapin*, 3 Pick. 180; *Penn. &c. R. Co.* v. *Braxton*, 34 Fla. 479. From the record it appears that the letter was dated March 28, 1909. The lease was dated May 1, 1908. The building should have been erected under the terms of the lease by May 1, 1909. The writ issued April 29, 1909. To avoid a technical objection that defendants were not yet in default under their agreement, the letters to each of the defendants, together with their subsequent admissions that they intended to do nothing, were introduced by plaintiff to rebut any contention that the action was premature. There is evidence that the letter was recognized and referred to by both Dunn and O'Connor in a subsequent conversation with the plaintiff, and it was admissible to connect and explain such admissions and conversations. *Dutton* v. *Woodman*, 9 Cush. 255, 262. This exception is overruled.

Exception 11 (page 51). This exception was to the admission of evidence of what the defendant O'Connor said during a conversation with the plaintiff, when the possibility of a

settlement was being discussed between them, after this action was brought, to the effect that, if the plaintiff brought (11) him into court, there wouldn't be a chance in the world for the plaintiff, as Fahey, Dunn and O'Connor had rehearsed their story over and over, and he himself would swear the court house out, if necessary. That any such statement was made was positively denied by O'Connor. The question covered by this exception was objected to solely on the ground that it was leading. The question was not leading; it did not suggest what answer was expected from the witness, and even if it were, the propriety of it was in the discretion of the court. The answer, however, disclosed that its admission was proper as a matter of public policy, if for no other reason. The statement made by the defendant O'Connor was proper testimony also, as affecting his veracity. We find no error in its admission and the exception is overruled.

(12)    Exception 12 (pages 108, 109). This was to the refusal of the court to allow the defendants' counsel on cross-examination to ask the plaintiff why he didn't accept the option before meeting the defendants, if he had made up his mind to accept it, anyway. As suggested by the court, if the plaintiff exercised his option before it expired he was within his rights. Whatever motive he may have had for delay, or whatever reason he may have had for not accepting the option, before he met the defendants, or the entire absence of either motives or reasons, either way, within the time provided in the option was wholly immaterial. This exception is overruled.

(13)    Exceptions 23, 24, 25, 26 and 27 (pages 197, 201, 204, 210, 211). These were all exceptions to the introduction of testimony of a real estate broker, who qualified as an expert, as to the value of the option in 1908, as to the value of the property in April or May of that year, and as to the rate at which it had increased in value during the ten years preceding the trial, and the reasons for such increase. The testimony was properly admitted both as showing the familiarity of the witness with the property in question and with other

surrounding property, as a part of his qualification as an expert, and was also admissible as showing the value of the option of which the plaintiff allowed the defendants to avail themselves as a part of the consideration for the agreement between the parties. The defendants' objection is principally based upon erroneous views as to the measure of damages, which we have already fully discussed. These exceptions are overruled.

Exceptions 31 and 34 (pages 255–272). This was to the ruling of the court allowing Mr. Richard A. Hurley to testify as an expert to the value of the property, its probable rate of increase in value and the value of the option. Defendants admit that the question whether any witness can testify as an expert is always largely in the discretion of the trial justice, but contend that Mr. Hurley showed so little personal knowledge of the values at different times of properties near enough to the property in question to be affected by much the same conditions, that he clearly never ought to have been allowed to testify.

The objections urged by the defendants go to the weight of this testimony, rather than to its admissibility. "The competency of persons offered as experts is generally a question to be decided by the trial court. If error is committed in admitting an incompetent person, the cross-examination to which he is subjected may generally be relied upon to show his ignorance and neutralize the force of his opinions. Unless the ruling of the court is palpably and grossly wrong, it will not be reversed by the reviewing tribunal. Rogers on Expert Testimony, §§ 22, 23; Lawson on Expert Evidence, 276, 468; Gillet on Indirect Evidence, § 209; *Howard* v. *Providence*, 6 R. I. 514; *Sarle* v. *Arnold*, 7 R. I. 586.'' *Ennis* v. *Little*, 25 R. I. 342. These exception are overruled.

Exceptions 32 and 33 (pages 258, 263). These were to the admission of testimony by Mr. Hurley similar to that already discussed under Exs. 23–27, above, and the exceptions are overruled for the same reasons.

Exceptions 37, 38 and 39 (pages 289 second, 290, 291). These were taken to the refusal of the trial justice to permit Mr. Hurley to answer certain questions asked him on cross-examination by the defendants' counsel. He was asked what a man could get for the option from Mr. Sherwood on the last day of it, if he was not going to exercise it himself. The court refused to allow this on the ground that the question at issue in the case was not what the plaintiff could get for the option. The witness was also asked if a great deal does not depend on whether a man has means to exercise an option himself or has to raise funds from some one else. The exclusion of these questions was proper; they were wholly immaterial. It was shown that he had accepted the option and had made use of it as a basis of an agreement with the defendants. Whether he could have got anything for it from other parties, or whether he could have exercised it himself without aid from other parties was not in issue, since he had exercised it with the aid of the defendants and for their mutual benefit and made use of it as a basis for an agreement whereby all of the parties might have been benefited had the defendants in good faith carried out their agreement. These exceptions are overruled.

Exceptions 40 and 41 (pages 293, 294, 297). These were taken to testimony given by William H. Herrick as a real estate expert as to the value of the option in April, 1908, and as to his opinion at the time of the trial of the rate of increase in the value of this property for ten years following April, 1908. The defendants' objections were based upon the same grounds as in previous exceptions to testimony of other experts, and these exceptions are overruled for the same reasons.

Exceptions 43 and 44 (pages 300, 312). These were taken to the admission of testimony by Mr. Herrick that shortly after the lease was executed Mr. Dunn said that his price for it was $30,000. The testimony related to a conversation shortly after the acquiring of the property by the defendants under the lease from the owner Sherwood, and was a proper

admission against interest, as fixing in the estimation of the defendant Dunn, who was largely interested in real estate, as an investor and builder, the value of the lease which the defendants obtained under the option; it was also proper testimony, taken in connection with other testimony in the record, particularly the testimony of Dunn himself, as to other offers made by him to sell the lease to explain the conduct of the defendants in their treatment of the plaintiff after they had thus acquired all his rights and had gotten this property into their own hands. We think this testimony was properly admitted, and these exceptions are overruled.

Exception 45 (page 320). This was to the refusal of the court to allow the witness to tell on cross-examination whether he thought a two-days' option as valuable as one for twenty-five days. The question was immaterial for reasons already discussed (Exs. 37–39) and the exception is overruled for the same reasons.

Exception 47 (page 331). This was to the admission of a paper containing figures given by Mr. Dunn to a real estate agent to be used in interesting a prospective purchaser of the leasehold interest not long before the time of the trial. This evidence was properly admitted for the same reasons already given (Exs. 43–44) and this exception is overruled.

Exception 52 (page 414). This was taken to the ruling of the court compelling Mr. Dunn to tell how much he asked for the property when The Shepard Company was trying to buy it. This ruling was correct for the reasons already given, and this exception is overruled.

Exceptions 53, 54, 55 and 56 (pages 436, 437, 438, 439). These were taken to repeated refusals by the court to allow questions asked on redirect examination of Mr. Dunn to clear up a certain confusion in his testimony caused by the fact that he did not remember what day of the week April 21, 1908, was and thought it was Monday. Questions were asked for the purpose of refreshing his recollection on this point, and a calendar for the year 1908 was offered to him for the same purpose. An examination of the testimony does

not show that the matter was of sufficient importance to warrant the further continuance of this line of questions, which would probably have confused the jury. We find no error in these refusals, and think the court properly exercised its discretion. These exceptions are overruled.

Exception 57 (page 443). This was taken to the refusal of the court to permit the defendants' counsel to ask Mr. Sherwood whether the plaintiff paid anything for the option. The question was entirely immaterial. The value of the option to the parties in this suit was not predicated upon what the plaintiff paid for it or whether he paid anything for it or not. The question was properly excluded and the exception is overruled.

Exceptions 59 and 60 (pages 445, 447, 448). These were taken to the refusal of the court to allow the defendants to prove by Mr. Sherwood that he had been trying to sell his property for some time for less than $42,000 and had not succeeded, and that, shortly before he gave the option to the plaintiff, he had had an option out for some weeks by which the property could be bought for $40,000, and that it was allowed to expire without being used. These matters were quite immaterial; if proved they would simply show that Mr. Sherwood had not been fortunate enough to find a purchaser; the fact that he gave an option of immediate purchase to the plaintiff at $42,000, of purchase in two years at $45,000, and in ten years at $50,000, under the option proved in this case, which option was accepted, and of which the defendants availed themselves, was all the evidence necessary as to the price at which Mr. Sherwood was willing to sell. It made no difference at what price he had previously offered to sell, or that he had not been successful. These exceptions are overruled.

Exception 61 (pages 450–453). This was to the refusal of the court to allow Mr. Sherwood to tell what occurred when the plaintiff and Mr. Fahey came to his office on the Saturday before the option would expire and asked for an extension of time. In view of the fact that the option was not allowed to expire, but was finally accepted and exercised,

it was quite immaterial what was said about an extension. This exception is overruled.

Exceptions 63 and 64 (page 469). These were to the refusal of the court to allow the defendants' counsel to ask Mr. Sherwood what his reason was for holding the option open for one day after Monday, April 20. The question was quite immaterial. It did not make any difference why Sherwood held the option open and allowed these parties to avail themselves of it, so long as he was willing to do it. These exceptions are overruled.

Exception 66 (page 629). This was to the refusal of the court to allow Mr. O'Donahue to state to the jury the differences that in his opinion were material between the contract and the lease. The question was properly excluded; first because it left it to the witness to say what variations seemed to him to be material, instead of having the differences, if any, pointed out, and leaving the court to instruct the jury as to whether they were material or not, for the jury to consider. Furthermore, an examination and comparison of the lease with the option shows that there is no substantial variation of terms between the two, the only additional provision in the lease being the agreement by the lessor in case of purchase to accept 75 per cent. of the purchase price on mortgage, there being no express stipulation in the option as to the terms of payment in case of purchase. We do not regard this as such a material variation as to make it necessary that it should have been called to the attention of the jury. This exception is overruled.

Exception 70 (page 699). This was to the refusal of the court to permit Mr. Sherwood to testify whether he would have allowed the plaintiff to accept the option, if he had not had a satisfactory financial backer. As it was provided in the option that the plaintiff should give bond with sureties satisfactory to Sherwood to build the building, it is evident that it was contemplated that Eastman should have a "satisfactory financial backer," and he testified that he already had one before he met the defendants. Under the circumstances, as they transpired, it turned out that the

plaintiff did not need to give the bond, since the lease was made directly to the defendants whose responsibility was satisfactory to Sherwood. It was quite immaterial what Sherwood would have done under other circumstances. This exception is overruled.

Exceptions 69 and 72 (pages 692, 706). These were taken to the exclusion of questions asked by the defendants' counsel of real estate men, who were testifying as experts in their behalf, as to the degree of certainty with which real estate agents could estimate the probable rate of increase in value of property like that involved in this case for ten years in the future. These questions were objected to on the ground that they called for opinions from the witnesses as to the value of the testimony of other experts who had testified in the case, and were rightly excluded on that ground. The defendants' witnesses were allowed full latitude in testifying as to the uncertainty which necessarily exists in the matter of the probable increase of value in real estate within a given period. These exceptions are overruled.

Exception 74 (page 711). This was to the exclusion of a question asked as to what a man with such an option as the plaintiff's could expect to get for it. The question as framed included statements of fact not in accord with the testimony and was rightly excluded. This exception is overruled.

Exception 75 (page 715). This was to certain statements made by the trial justice to the defendants' counsel in the presence and hearing of the jury, and which, the defendants claim, tended unfairly to prejudice the jury against them. An examination of the transcript at this point does not convince us that the court, in its colloquy with counsel, went beyond proper limits in discussion of the effect of certain testimony in the case, and its terse statement of the conflicting claims of the parties. We find no error, and this exception is overruled.

Exception 76 (pages 711–716). This raised the question, which has been already discussed, as to whether the financial ability of the plaintiff to handle the proposition contained in the option himself was a material element in its value.

We think, under all the circumstances of this case, that the rulings of the trial judge were correct. It is quite evident that the plaintiff supposed that, when he made his agreement with the defendants, he had put himself in a position to accept the option and to so handle it as to make it of ultimate value to all parties concerned. We find no error in the rulings and this exception is overruled.

(21)    Exception 77 (page 743). This was to the refusal of the court to allow the defendants' counsel to ask one of the real estate experts whether in his twenty-three years of experience he had ever known an option on real estate to be sold for any considerable sum. It was rightly excluded; if answered in the negative, it would have thrown no light upon the value of the option here in question; if answered in the affirmative, it would have opened a field of inquiry into sales of real estate options in general, with all their attendant facts and circumstances, wherever situate, known to the witness, and would doubtless have resulted only in confusion to the jury and undue extension of the record. This exception is overruled.

All of the defendants' exceptions are overruled; the case is remitted to the Superior Court, with direction to enter judgment for the plaintiff upon the verdict.

*John W. Hogan, Philip S. Knauer*, for plaintiff.
*Gardner, Pirce & Thornley*, for defendants.
*William W. Moss*, of counsel.